**Kevin Lee BIGLOW, Plaintiff,**

v.

**THE BOEING COMPANY, Defendant.**

**No. CIV.A.00–2370–KHV.**

United States District Court,
D. Kansas.

Nov. 29, 2001.

1038

Dennis E. Egan, Claudio E. Molteni, Popham Law Firm, P.C., Kansas City, MO, Deborah L. Hughes, Lawrence, KS, for plaintiffs.

Jay F. Fowler, J. Steven Massoni, Todd N. Tedesco, Boyd A. Byers, Foulston & Siefkin, L.L.P., Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Kevin Lee Biglow brings employment discrimination and retaliation claims against The Boeing Company ("Boeing") under the Civil Rights Act of 1871, 42 U.S.C. §§ 1981 and 1983.[1] This matter comes before the Court on *Defendant's Motion For Summary Judgment* (Doc. # 148) filed October 17, 2001. For reasons stated below, the Court sustains defendant's motion.

### Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine

---

1. On October 4, 2001, the Court sustained defendant's motion for partial summary judgment on plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* as amended, and the Kansas Acts Against Discrimination, K.S.A. § 44–1001 *et seq. See Memorandum And Order* (Doc. # 141). The Court further found that a two-year statute of limitations applied to plaintiff's Section 1981 claims, and that plaintiff had presented a genuine issue of material fact regarding whether his Section 1981 claims should be equitably tolled for approximately one year from February 1997, when defendant raised Randy Bellew's pay, to February 1998, when plaintiff learned that Jeff Lyon and Jeff Martin had received raises. *See id.* at 9–11.

issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *See Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### Facts

The following facts are either uncontroverted or construed in a light most favorable to plaintiff.[2]

Boeing manufactures commercial airplanes, military aircraft and missile, space and communications systems. It is based in Seattle, Washington and maintains an aircraft engineering, fabrication and assembly center in Wichita, Kansas. The Wichita operation consists of four divisions: (1) Boeing Commercial Airplane

---

**2.** The first 25 pages of plaintiff's brief is entitled "Plaintiff's Statement Of Material Facts As To Which Genuine Issues Exist." *See Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment* ("*Plaintiff's Memorandum*") (Doc. # 155) filed November 2, 2001 at 1–25. Plaintiff, however, has not set forth each additional fact in a separately numbered paragraph as required by D. Kan. R. 56.1(b). Rather, plaintiff includes 25 pages of factual material under five numbered paragraphs, some of which extend more than ten pages and con-

tain multiple sub-parts. Because plaintiff has violated the local rule, the Court disregards the factual assertions contained in this section of his brief. *See, e.g., Clemmons v. Nelson,* No. 94–3474–KHV, 1998 WL 726077, at \*1–2 (D.Kan. Sept.4, 1998). Similarly, the Court does not consider any factual assertions which plaintiff makes for the first time in his argument section. On the merits, however, the Court has reviewed the assertions and discerns nothing which would change the result herein.

Group ("Commercial"); (2) Wichita Military Modification Center ("Military"); (3) Shared Services Group ("Shared Services"); and (4) Boeing Airplane Services ("Airplane Services"). Shared Services provides computing and information support services to the entire Wichita facility, including Commercial and Military. Employees in Shared Services are divided according to whether they support Commercial or Military. They nevertheless work together and hold weekly staff meetings to ensure that they are operating as a team. From 1995 to June 30, 2001, Gerry Johnson was the vice president and general manager of Shared Services. Johnson was the highest ranking officer in the division and reported directly to higher level management in Seattle.[3]

Jeff Turner has been the vice president and general manager of Commercial since 1995. Turner is the highest ranking officer in Commercial and reports directly to higher level management in Seattle, Washington. Turner describes himself as "the number one man in terms of management" at the Wichita facility. Turner Depo. at 5, ll. 19–22, Exhibit J to *Plaintiff's Memorandum*. Johnson, however, did not report to Turner.

In April 1989, Boeing hired plaintiff, who is African American, to work as an operator 1 data processor in Shared Services.[4] In December 1991, Boeing promoted him to systems configuration specialist.

In July 1992, Boeing reduced its work force in Wichita. To avoid a layoff as to plaintiff, Boeing demoted him to an operator 3 data processor.

**New Salaried Payroll System**

In early 1993, Boeing implemented the New Salaried Payroll ("NSP") system, which implemented specialty descriptions and job classification codes.[5] The specialty descriptions described job families, with each description containing a specialty summary and level description. The specialty summary provided an overview of the level descriptions, which described the work in detail and the qualifications required for each level or grade. The key ingredient in the specialty description was the description of work, which determined the job grade. The NSP associated each specialty level with a pay grade, and each pay grade with a specific salary range. Under the new system, Boeing could not classify an employee at a particular grade level unless he or she earned a certain minimum salary.

The NSP created the selective salary adjustment fund ("SELA fund"), which contained all funds allocated for salary planning activities, including salary adjustments, lump sum awards and promotions/reclassifications. To promote an employee to a higher salary, a manager had to use money from the SELA fund. Each division could set constraints on its distributions from the SELA fund. For

---

**3.** Unless otherwise noted, references to Johnson refer to Gerry Johnson.

**4.** Although the record is unclear, it appears that plaintiff supported Commercial at that time.

**5.** Plaintiff objects to defendant's use of an affidavit by Jeffrey McCune, human resources manager, because McCune testified in his deposition that he did not have personal knowledge regarding plaintiff's salary history. *See Plaintiff's Memorandum* at 44–45. As a preliminary matter, plaintiff does not cite the alleged deposition testimony. More importantly, plaintiff's argument is without merit. A cursory review of the affidavit reveals that it concerns general matters regarding Boeing's compensation scheme—facts which plaintiff does not controvert—and not facts which relate to plaintiff's individual salary history. *See* Affidavit Of Jeffrey R. McCune, Exhibit to *Memorandum In Support Of Defendant's Motion For Summary Judgment ("Defendant's Memorandum")* (Doc. # 149) filed October 17, 2001. Thus plaintiff articulates no legally sufficient reason to strike the affidavit.

instance, before releasing SELA funds to line management, a division director could establish a contingency fund to cover unplanned promotions and other special compensation needs. Directors could also carry over a portion of the SELA fund to the next year, subject to limitations imposed by compensation. As director of Shared Services, Johnson regularly released all of the division's SELA fund to line management. Shared Services nevertheless maintained a small contingency fund comprised of any money which line management did not spend.

Under the NSP, first level managers and human resources determined salary planning groups. Typically, all employees with the same first level manager were in one salary planning group. Sometimes, one manager's employees were split into two groups or several managers' employees were combined into one group. Boeing distributed SELA dollars to line managers based on the aggregate salaries of the employees in each salary planning group. Thus first level managers received SELA money in an equal proportion to the total payroll of their salary planning group.

Each first level manager, together with Human Resources, was responsible for evaluating employee performance, determining salary adjustments and communicating the results to the employee. Boeing expected first level managers to (1) classify employees according to the work they performed, (2) match an individual employee's salary to the minimum pay grade requirements, and (3) ensure the availability of adequate funds for proposed salary increases. Boeing did not require managers to give minimum raises to employees. In fact, the amount awarded to any one employee in the group decreased the money available to pay other employees in the group.

In yearly salary planning exercises, first level managers submitted their salary adjustment plans to Human Resources—which provided administrative support functions, such as giving employee salary histories, entering the planned actions into a database, and preparing and redistributing reports. Human Resources also served a "check and balance" function to make sure that employees' pay corresponded with their duties and abilities. Human Resources did not decide how to allocate SELA fund money. The compensation department reviewed the salary plans for each division to make sure that managers had not exceeded their allotted SELA fund and to check for statistical disparity as to women and minorities.

Boeing instructed managers to set aside money from their SELA fund allocations to cover the cost of promotions. In exceptional cases, such as where market conditions required extreme measures for large numbers of employees, a manager could appeal to the compensation department for additional funds. A first line manager could also request money from the division's contingency fund. A designated team of three to five second level managers handled such requests. In addition, a manager could request that an out-of-sequence salary increase be charged to his or her SELA fund for the following year.

Boeing policies prohibit discrimination on the basis of race in all terms and conditions of employment, including promotions, compensation and benefits. If Boeing determines that an employee has been paid less as the result of discrimination, it will take funds from its general overhead account to correct the situation.

**Alleged Failure To Promote**

In June 1994, plaintiff unsuccessfully applied for a position as systems configuration specialist 2, supporting Commercial.[6]

---

6. The NSP specialty description for the posi-    tion of system configuration specialist identi-

Mike Richerson, first line manager over the position, selected plaintiff and two white employees, Randall Bellew and Kim Zehr, as finalists for two positions. Richerson chose Bellew and Zehr, both of whom had previously worked with plaintiff as systems configurations specialists and had been demoted as part of the downsizing in July 1992. Richerson told plaintiff that other managers had rated Bellew and Zehr higher than him but because Richerson would not provide specific information about the ratings, plaintiff believed that Richerson made the decision based on race. Plaintiff had more experience performing the job functions of the position and, although Bellew and Zehr had worked at Boeing longer than plaintiff, plaintiff felt that he was as qualified as Bellew and Zehr. Zehr had a four-year college degree, while plaintiff had only a high school education. Plaintiff describes Bellew and Zehr as "good workers" and "go-getters." Plaintiff's Depo. at 146, Exhibit to *Defendant's Memorandum*. As a result of the promotion, Bellew's salary increased from $24,500 to $25,900, and Zehr's salary increased from $23,550 to $25,900.

Four months after plaintiff lost his bid for the position of systems configuration specialist 2 in Commercial, in October 1994, Boeing promoted plaintiff to the identical position supporting Military. Cecil Gardner, first line manger, interviewed, hired and managed plaintiff in the new position.[7] Plaintiff already had experience to perform grade 51 work, but Gardner planned for plaintiff to work at grade 48 for six months (until April 1995) and then move to grade 51. Thus plaintiff did not receive a pay raise at the time of the promotion; his pay remained at $24,100. Although Boeing had adopted the NSP in early 1993, Gardner believed at the time that the old payroll system was still in effect. Under the old system, Gardner could receive money for a promotion if his boss, Human Resources and compensation approved his recommendation.

**Alleged Pay Inequity**

In his new position, plaintiff performed the same tasks as Bellew and Zehr except that they supported Commercial and he supported Military. Bellew and Zehr had a different first-level manager and were in a different salary planning group and a different location than plaintiff. Because they had been promoted from low-paying data jobs, their salaries were below their peers who supported Commercial.

In February 1995, Gardner discussed with Warren Korphage, a manager in Human Resources who supported Shared Services, a potential promotion for plaintiff. Korphage told Gardner that to promote plaintiff, he would have to use $9,500 from his SELA fund. This decision would diminish funds available for other employees in his group. Gardner believed that this would be unfair, and he told plaintiff that he did not have money to raise his pay to grade 51. Instead, effective August 18, 1995, Gardner raised plaintiff's pay to $26,600, a $2,500 raise which was still at grade 48. Gardner nevertheless believed that plaintiff was performing grade 51 work and should be paid at that level. At the time, Gardner was responsible for two salary planning groups: JAB, which had

---

fied computing (code J) as the major function and computing technology (code L) as the minor function. Three specialty levels are identified, each with a corresponding pay grade: level 1 is grade 46, level 2 is grade 48, and level 3 is grade 51. From 1994 to 1998, the minimum salaries for each grade were as follows:

| Beginning | Grade 46 | Grade 48 | Grade 51 |
|---|---|---|---|
| April 15, 1994 | $20,600 | $25,900 | $33,600 |
| April 15, 1995 | 20,900 | 26,600 | 34,800 |
| April 12, 1996 | 20,900 | 26,600 | 34,800 |
| February 7, 1997 | 21,700 | 27,600 | 36,200 |
| February 6, 1998 | 21,700 | 28,000 | 37,500 |

7. Gardner, an African American, retired from Boeing in 1999.

eight employees and JAD, which had seven employees including plaintiff. Gardner had unlimited discretion to transfer his SELA funds from one group to the other.

Plaintiff discussed his pay with Gardner many times. Each time, Gardner said that he did not have enough money to raise plaintiff's pay. Gardner stated that he had requested special funds from his managers, but no money was available. Gardner ultimately developed a plan to increase plaintiff's pay over the course of several years by using his SELA fund and requesting special funds from upper management. On a continuous basis, Gardner asked his supervisors, including Alan Johnson and Armond Friend, for additional money to compensate plaintiff. Gardner believes that he primarily got what he asked for in those conversations—special funds for plaintiff in the amounts of $1,000 and $300.

From 1995 to 1997, Daniel Vickers performed grade 53 work as a system administrator but was classified and paid as a grade 51 systems configurations specialist 3.[8] Vickers was in Gardner's JAD salary planning group, the same as plaintiff.

In 1995, Boeing raised Bellew's pay by $2100 (to $28,000) and Zehr's pay by $1750 (to $27,650).

In 1996, Gardner raised plaintiff's salary by $1,350 (to $27,950) effective April 12, 1996. This was the largest increase in the JAD salary planning group. During the 1996 salary planning exercise, Gardner used $1,057 from the JAD group for salaries in the JAB group. In addition, Gardner overspent salaries in the JAB group by $494, which was covered by the contingency fund. After Gardner completed the 1996 salary planning exercise, he requested and received an additional $1,000 for plaintiff, effective July 5, 1996, resulting in a total salary of $28,950.

In 1996, Boeing raised Bellew and Zehr's pay to $33,600 each.

On May 7, 1996, Boeing transferred Jeff Martin, a white employee, to a position as system configuration specialist 2 supporting Commercial.[9] In this position, Martin performed predominately grade 51 work for grade 48 pay.

On July 16, 1996, Boeing promoted Jeff Lyon, another white employee, to a position as system configuration specialist 1 supporting Commercial.[10] In this position, Lyon performed predominately grade 51 work for grade 46 pay, earning $25,400. Laura Ringle and John Noonan supervised Martin and Lyon.[11] They developed a plan to use SELA funds and special requests to raise the salaries for Lyon and Martin to grade 51.[12]

**8.** Vickers is Caucasian. The record contains no evidence regarding whether Gardner attempted to raise Vickers' pay.

**9.** Martin began working for Boeing in November 1986 as an operator 1 in data processing. Boeing promoted him to operator 2 in 1988 and operator 3 in 1989. In August 1994, Boeing promoted Martin to distributed systems operator 2 at grade 47. In April 1996, Boeing promoted Jeff Martin to distributed system operator 3 at grade 48.

**10.** Lyon began working at Boeing as a business systems coordinator 2 in April 1989, at a salary of $14,400. In December 1989, he moved to the job of data processing operator 1. In August 1990, Boeing promoted him to data processing operator 2.

**11.** Between 1996 and 1998, Ringle and Noonan co-managed a group of 30 to 50 employees as part of an experiment in team management. Toward the end of the experiment, Boeing added Mike Richerson and his employees to the group.

**12.** Plaintiff asserts that Lyon and Martin were "doing moves," while he performed "problem determination." Plaintiff's Depo. at 263, l. 15 to 264, l. 12, Exhibit A to *Plaintiff's Opposition.*. Plaintiff has not established when they performed these allegedly different job functions, nor does he explain the alleged difference. Plaintiff merely states that he performed a higher level job than Lyon and Martin. *See id.* at 264, ll. 10–12. Plaintiff does

In 1997, Gardner increased plaintiff's salary by $1,400 (to $30, 350) effective April 11, 1997. This was the largest increase in the JAD salary planning group. Gardner overspent $22 on the JAD group and $1,016 on the JAB group. The contingency fund covered both amounts.

In February 1997, Boeing promoted Bellew to grade 51 and increased his pay to $36,200. Over the course of more than two and half years, Bellew's managers had used SELA funds to increase his salary to grade 51. Bellew believed that he had been performing grade 51 work the entire time. Bellew did not request or receive retroactive pay for the two and half years during which he had performed grade 51 work but received a grade 48 salary.

In April 1997, Boeing increased Lyon's salary to $26,700, Martin's salary to $29,450 and Zehr's salary to $35,100—all below the grade 51 minimum.

On July 28, 1997, Lyon sent Turner an e-mail which complained that he was performing work at a higher level than his salary. Ringle received a copy of the e-mail and prepared a proposed plan for Lyon. She also noted that Zehr, Martin and Lyon were performing grade 51 work at lower pay. Ringle was frustrated with her efforts to raise to grade 51 the salaries of Lyon, Martin and Zehr. She repeatedly requested additional money, but representatives in Human Resources and compensation answered that she had to handle the issue through the yearly salary planning exercise. Ringle was unhappy with the lack of available options and the lack of support from compensation. As of September 18, 1997, Lyon and Martin earned thousands of dollars less than other system configuration specialists who sup-

ported Commercial. Ringle did not know whether any employees who supported Military were in the same position.

On October 27, 1997, Ringle helped Lyon prepare for a meeting with Johnson, the vice president and general manager of Shared Services. Ringle counseled Lyon to focus on changing the policy rather than changing his individual situation. During the meeting, Lyon told Johnson that he and Martin were performing 51 grade work but receiving lower grade salaries. After the meeting, Johnson reviewed Lyon's salary plan, which proposed that Lyon would continue to do grade 51 work but be classified and paid at grade 48 for seven years, during which time his managers would try to raise his pay to grade 51 with SELA funds and any leftover contingency funds. Johnson thought that it was unacceptable to have Lyon work for so long outside his pay grade, and wrote that it was "[n]ot a logical plan."

On October 28, 1997, Joe Martin, a white employee (not related to Jeff Martin), sent Turner an e-mail on behalf of Lyon. Joe Martin stated that he had quit his computing job because of similar problems. Turner forwarded the e-mail to Leroy Hampleman,[13] stating that he was concerned about "the systemic problems that cause a guy like Joe to be so frustrated" and that "these procedures that force us to put people in low graded jobs to match their salaries." Turner Depo. at 59–64.

At Johnson's request, Human Resources confirmed that Lyon and Martin were performing grade 51 work and determined that SELA funds available to their salary planning group could not correct the problem. Johnson opined that the only option

not dispute that Lyon and Martin performed grade 51 work.

**13.** The record is unclear regarding Hampleman's job title. Based on the context of Tur-

ner's deposition testimony, it appears that he may have worked in Human Resources or compensation. *See* Turner Depo. at 62–64, Exhibit to *Defendant's Memorandum.*

was to move Lyon and Martin to lower grade work consistent with their compensation. Johnson thought that it was a mistake to allow an employee to perform grade 51 work at lower grade pay, and he expressed his displeasure to Ringle.

Ringle and Noonan consulted with Friend, Richerson and Lynne Skaggs, personnel representative, and developed a solution to correlate the employees' work assignments and pay. They gave Lyon a $1,000 pay raise to meet the grade 48 minimum, and moved Lyon and Martin to a different area to perform grade 48 work. In addition, they increased Zehr's pay to $36,200 to meet the grade 51 minimum. Both raises were out of sequence and charged to the 1998 SELA fund. For 16 months, Lyon had performed grade 51 work for grade 46 pay, and for 18 months, Martin had performed grade 51 work for grade 48 pay. Neither requested or received retroactive pay for this time.

On October 29, 1997, Martin sent Turner a letter which complained that the reduction in his responsibilities was unacceptable and unfair. Martin sent Johnson a copy of the letter. Within a week or two, Johnson told Martin that he knew about other employees in similar situations. Johnson stated that he planned to ask the corporate office for additional funding for promotions, and asked Martin to be patient.

In 1997 or 1998, several employees under Gardner (including plaintiff and Van Dunn, a white employee) became concerned that their counterparts who supported Commercial were getting bigger raises and making more money. Dunn complained to Gardner, who said that he had to give less money to Dunn so that he could give more money to other employees in the group. Like plaintiff, Dunn was in the JAD salary planning group.[14]

In 1997 or 1998, Gardner wrote a memorandum which stated that he had made some progress with his plan to raise plaintiff's pay to grade 51, but that it had been slow and could take several more years to accomplish.[15] Gardner noted that his SELA fund pool was small and limited his ability raise plaintiff's salary.

In January 1998, Boeing held company-wide compensation meetings and addressed whether to continue the requirement that managers pay for promotions out of the SELA fund. The compensation department recommended ending the practice. Johnson had been pushing for a separate promotion fund for some time, and after the meetings, Boeing changed the process. After February 12, 1998, managers could charge promotional salary increases to a new promotion fund. Unlike the SELA fund, the promotion fund was not limited to a specific sum. Rather, corporate headquarters instructed the Wichita compensation department to be judicious with the promotion money and not spend more than .8 per cent of the total payroll on promotions. Boeing also warned that it would discontinue the promotion fund if Wichita spent too much.

Boeing managers, including Gardner, were pleased that Boeing had implemented the promotion fund. At least 20 managers, including all of the managers in information systems, were having problems like Gardner was trying to work out for plaintiff. In the beginning, compensation was

---

**14.** Defendant submits evidence regarding a pay disparity for Jerry Hoppock, a white employee. *See Defendant's Memorandum* at ¶ 65. It appears that this occurred around 1992, before plaintiff's problems arose, under a different payroll system. The Court has not included those facts because they are not relevant to plaintiff's claims.

**15.** The record is unclear to whom Gardner wrote the memorandum.

very conservative in approving promotion funds because it feared too many requests from managers. Also, because 1998 was a transitional year, Boeing expected its managers to use a portion of their SELA funds for promotions during that year.

When the promotion fund became available, Johnson told Human Resources to place Lyon and Martin back in their old jobs. Johnson testified that he did this "because Jeff [Lyon] had met with me on the topic ... [and] I was personally involved in this one because I personally had the visit by Jeff." Johnson Depo. at 77–78, Exhibit to *Defendant's Memorandum.* If an executive level manger became involved with a compensation issue, the compensation department gave top priority to the issue.

On February 27, 1998, Boeing promoted Lyon and Martin to grade 51 and increased their pay to $37,500, the grade 51 minimum. Lyon and Martin returned to the jobs which they had performed under Ringle before they were moved in October 1997. To fund Lyon's promotion, Boeing paid $1,250 as an out-of sequence SELA fund adjustment and $8,250 from the promotion pool. To fund Martin's promotion, Boeing paid $1,350 as an out-of sequence SELA fund adjustment and $6,700 from the promotion pool. Neither Lyon nor Martin received additional money during the salary planning exercise in April 1998.

Plaintiff believes that Lyon was promoted because he is white and had connections with white upper level management. Lyon believes that he was finally promoted because he complained to top level management. Before that, Lyon had complained to Skaggs (a personnel representative), who told him that his manager should not have put him in the position and that it was his manager's responsibility to fix the problem.

On March 26, 1998, plaintiff sent Johnson an e-mail which expressed his "deep concerns" regarding his compensation for the past three and a half years. Plaintiff's Depo. at 221–222. Plaintiff explained that he had "nothing but trust and respect" for Gardner, but that Gardner's attempts to get money to increase his pay had been futile. *Id.* After describing his complaints in detail, plaintiff concluded,

I have several questions that I would like to have answered, But [sic] only 2 that I care to mention in this letter. Why have I had to wait 3 and 1[sic] half years and currently still [sic] waiting to be compensated fairly and equal to those performing same jobs?

Why was a lump sum increase given to these individuals first? I have been waiting much longer 3[sic] and 1 half years to be exact; If [sic] possible I would like to meet with you and whom ever [sic] you require to be present to discuss this matter.

*Id.* Johnson does not recall being aware of plaintiff's situation before he received the e-mail. Johnson asked Korphage to evaluate the e-mail. Johnson also discussed the e-mail with Friend.

On March 31, 1998, plaintiff sent Friend an e-mail which stated:

Armond, right now I do not feel a sense of urgency on you alls [sic] part in trying to correct this matter; There have [sic] not even been a reply from my previous letter. I do know that Cecil Gardner and a few other individuals have been contacted, but Armond I wrote the letter and asked for a convenient time to discuss my concerns and have some questions answered, [sic] I have a great amount of frustration about this, primarily because I feel like I am being ignored. I am asking for the opportunity to sit down with you, Warren Korphage, and Cecil Gardner as soon as possible so that I can be heard and have some simple questions answered.

Exhibit 9 to Plaintiff's Depo. Within two and half hours, Friend told plaintiff that he would discuss the matter with Korphage and set up a meeting.

During the salary planning exercise in April 1998, Gardner asked Friend for $7,150 from the promotion pool to bring plaintiff's salary to $37,500, the grade 51 minimum. Gardner also proposed adding money from his SELA fund to give plaintiff a total salary of $39,350. Friend told Gardner that he did not want to open the "flood gates" to the promotion fund and asked if Gardner could wait until November 1998. Gardner agreed to take $300 for plaintiff at that time and wait until November to promote him to grade 51.

When Gardner told plaintiff that he received an extra $300, plaintiff was unhappy and said that it was a "slap in the face." After this conversation, plaintiff talked with Lyon on the telephone. Lyon told plaintiff that he and Martin had recently been promoted to grade 51 and received large pay raises. Plaintiff complained to Gardner, who called Korphage on the speaker phone with plaintiff present. Korphage confirmed that Lyon and Martin had been promoted to grade 51, saying, "Goddamn, Cecil, those guys were told to keep their fucking mouths shut. Yes, it's true." Plaintiff's Depo. at 220, ll.2–4, Exhibit to *Defendant's Memorandum.* Gardner replied, "Goddamn, Warren, I hope you know that Kevin Biglow can file a fucking discrimination lawsuit against you all's asses." *Id.* at ll. 10–13. Korphage responded, "Yes, I know." *Id.* at l. 14. The conversation upset Gardner.

On April 6, 1998, plaintiff met with Friend, Gardner, Korphage and Skaggs. Plaintiff complained that for three and a half years he had performed grade 51 work at lower pay. Plaintiff also said that he had learned of Lyon and Martin's promotions and that he wanted retroactive pay to the time he began working in the job. Friend told plaintiff that they had two options: (1) move plaintiff to a job at his current salary level, or (2) increase plaintiff's salary to grade 51. Plaintiff interpreted this statement as an attempt to intimidate and threaten him in retaliation for his complaints. Plaintiff said that it would be wrong to move him to avoid paying him for work he had already performed. Plaintiff also asked Korphage about Lyon and Martin. Korphage said that they were special circumstances which he could not discuss. Plaintiff thought that Korphage meant that they are white and he is black. Plaintiff asked whether he was a special circumstance and Korphage would not comment. Plaintiff said that he felt like they were discriminating against him. This was the first time that plaintiff expressed this belief to management.[16]

Before the April 6 meeting, Korphage had met with Skaggs, Friend and Ginny Fiacco, in compensation. They decided not to pay plaintiff retroactively because it was not the normal practice. Korphage relayed this decision to Johnson, who agreed. In his deposition, Korphage admitted that plaintiff's circumstance of performing higher grade work for such a long

---

16. From the time he began working for Gardner, plaintiff knew that other employees were getting pay raises. Between 1995 and 1998, plaintiff repeatedly complained to Gardner about pay inequity. Within a year and a half after he began working for Gardner, plaintiff talked to Korphage about his pay. Korphage said that it was Gardner's responsibility to get the money to increase plaintiff's pay. Plain-tiff told Korphage that other employees were getting increases. Korphage replied that their managers were getting the money for them. Plaintiff "always" suspected that he was not getting promoted as fast or paid as much because of his race, but he did not share this concern with Boeing until April 1998.

time was not normal. Boeing does not have a policy which prohibits retroactive pay.

On April 10, 1998, Korphage, Skaggs and Fiacco met regarding plaintiff. They discussed various options and decided to promote him to the grade 51 minimum salary, effective retroactively to February 27, 1998 (the date of Lyon and Martin's promotions). In addition, they agreed to add the salary increase which Gardner had proposed in the April 1998 salary exercise, resulting in a total salary increase from $30,350 to $39,350. Korphage relayed the proposal to Johnson, who agreed.

On April 14, 1998, Boeing promoted plaintiff to grade 51 and increased his salary to $37,500 retroactive to February 27, 1998, with a merit increase of $1,850 effective April 10, 1998. On April 17, Korphage, Gardner, Skaggs and Friend informed plaintiff of the decision. Friend stressed the importance of confidentiality and stated that salary information is private and that plaintiff should not discuss it with co-workers. Plaintiff was thankful for the increase, but he told Korphage that it fell short of his expectation—a retroactive increase to six months after he started working as a systems configuration specialist.

On April 19, 1988, plaintiff met with Johnson, Friend, Gardner, Korphage and Skaggs. Plaintiff said that he was not happy with the final outcome. Plaintiff stated that he wanted to be treated fairly, *i.e.*, he wanted retroactive pay to compensate him for his loss. Johnson admitted that management had made a great mistake, but asked what he was supposed to do. Plaintiff replied that since plaintiff was not responsible for the mistake, he expected Johnson to correct it. Johnson told plaintiff that if he had been aware of the situation earlier, he would have moved plaintiff to a lower paying job. Plaintiff considered this a "threatened adverse action." Plaintiff's Depo. at 455. Plaintiff understood Johnson to mean, "if you keep pushing this, hey, look, this is something that we could do to you." *Id.* at 456.

Plaintiff believes that Boeing continues to discriminate against him by paying him less than Bellew and Zehr. As of April 1998, they earned the following amounts: plaintiff $39,350; Bellew $38,200; and Zehr $38,900. At the same time, Lyon and Martin both earned $37,500. By 2001, they made the following amounts: plaintiff $47,850; Bellew $44,650; Zehr $44,750; and Martin $43,200.[17]

Between 1994 and 1998, Gardner increased plaintiff's salary by 49.1 per cent. During the same time, two white employees in plaintiff's group (Dunn and Cecilia Smith) received salary increases of 10 per cent and 14.1 per cent, respectively.[18]

Managers who supported Commercial did not regularly meet with managers who supported Military. Plaintiff testified that Johnson conducted regular weekly staff meetings with employees who supported Commercial and Military, but the record does not indicate who attended these meetings or whether they were conducted together or separately. In any event, the parties agree that managers of Bellew, Zehr, Martin and Lyon did not know about plaintiff's pay situation and that Gardner did not know about the pay situations of Bellew, Zehr, Martin and Lyon.

### Salaried Job Classifications System

In 1999, as a result of its merger with McDonnell Douglas Company, Boeing re-

---

17. Lyon quit his job in June 1999, when he made $38,900.

18. The record does not indicate the job positions of Dunn and Smith, or the percentage salary increases for other employees in the group.

placed the NSP system with a new classification and payroll system called Salaried Job Classifications ("SJC"). In preparation for the change, Boeing mapped all the NSP jobs to new job titles and classification codes. The new system mapped the job of system configuration specialist 3 to the job of desktop system installer D. Effective February 12, 1999, Boeing converted plaintiff, Bellew, Zehr, Martin and Lyon to this new position.

The SJC system provided three sources of salary adjustment funds: (1) the annual salary planning fund; (2) variable fund generation; and (3) the non-charging promotional salary adjustment fund. The annual salary planning fund was similar to the SELA fund. Variable fund generation provided additional money to fund salary growth for certain salary review groups which had an unusually high percentage of employees at the lower end of the salary reference tables. The non-charging promotional salary adjustment fund was a continuation of the promotion fund which Boeing initiated in 1998.

*Williams* **Class Action**

On June 4, 1998, certain employees filed a class action lawsuit against Boeing. The suit, which was filed in the United States District Court for the Western District of Washington, alleged racial discrimination in employment. *See Williams v. The Boeing Co* Case No. C98 761C. Plaintiff was a member of the plaintiff class. In January 1999, the court provisionally approved a settlement agreement between Boeing and the plaintiff class. On April 21, 1999, however, plaintiff opted out of the class action. On August 14, 2000, he filed his complaint in this case.

On April 23, 1999, a group of class members filed an objection to the proposed consent decree. On September 30, 1999, the district court approved the consent decree, which the objecting class members appealed to the Ninth Circuit Court of Appeals.

**Alleged Retaliation**

Plaintiff alleges that Boeing retaliated against him in several respects, on account of his complaints of discrimination and filing this lawsuit.

**1. Christmas E-mail**

Plaintiff contends that Boeing retaliated against him for sending a Christmas e-mail. In December 2000, plaintiff sent an e-mail to about six employees, wishing them a Merry Christmas. The e-mail contained a link to a virtual greeting card at a web address. A recipient of the e-mail forwarded it to Barbara Montgomery, ethics advisor. Montgomery told the sender that she had violated PRO–10.[19] In addition, Montgomery wrote an e-mail to Skaggs, plaintiff's personnel representative, telling her to inform plaintiff that he had violated company policy. Montgomery did not know that plaintiff had made complaints against Boeing or that he had been involved in litigation against Boeing.

Skaggs reprimanded plaintiff over the telephone for sending the e-mail. This was not a formal disciplinary action, and she did not write plaintiff up. Skaggs kept a hard copy of the ethics documentation in her personal file, but she did not put it in plaintiff's personnel file.

Pursuant to company protocol, Montgomery prepared a call detail report on both plaintiff and the employee who had sent her the e-mail. The parties dispute whether a call detail report constitutes a

---

**19.** Boeing procedure PRO–10, entitled *Proper Use of Company, Customer, and Supplier Resources,* provides that employees may not use e-mail to send or post chain letters or messages of a religious nature. Possible disciplinary actions for violations of the policy include formal verbal warning, written warning, suspension and termination.

disciplinary record. The ethics department maintains call reports in an electronic database to document matters reported and actions taken—it is not maintained in the employee's personnel file. Only ethics employees can access and use the database. Personnel and line managers do not have access to it.

Boeing has no record of ever disciplining plaintiff (including verbal warning) for inappropriate e-mail or computer use.

From 1998 to August 1, 2001, Boeing has taken 258 disciplinary actions against employees for inappropriate use of company computers. Of those 258 disciplinary actions, 98 were for sending or forwarding non-work related e-mail messages including chain letters.

### 2. Paid Leave To Participate In Lawsuit

Plaintiff claims that Boeing retaliated against him because it did not pay him for time off to attend depositions in this case. Plaintiff is a member of the technical & professional bargaining unit ("the union"), which has a collective bargaining agreement with Boeing effective May 7, 2001. The agreement provides that Boeing will grant time off with pay for absences which are necessary for an employee to testify as a witness for Boeing or to respond to a subpoena to appear for a deposition. The agreement further provides that Boeing will not pay for absences in which the employee is subpoenaed or voluntarily seeks to testify or act as a direct party against Boeing or its interests. Before the collective agreement, Boeing had a similar policy.

Plaintiff asserts that Boeing paid other employees—Fred Roseborough, Nadine McClam–Brown and Mary Dean—for time they spent participating in the *Williams* case. McClam–Brown and Roseborough are African American employees who objected to the consent decree. On July 16, 1999, counsel for the objectors deposed Dean, another African American employee, in Wichita. Because Dean supported the consent decree, Boeing paid for her time off to testify. On February 6, 7 and 8, 2001 a mediation conference was held in Seattle in the *Williams* appeal. Dean attended the meeting in support of the decree, and McClam–Brown and Roseborough represented the objectors. Because their purpose was to settle the case, Boeing paid Dean, McClam–Brown and Roseborough to attend the mediation.

On March 26, 27 and 28, 2001, Dean testified as a named plaintiff in a gender class action suit. Also, on August 23, 2001, Dean testified on behalf of her husband in an action against Boeing. Boeing did not pay for Dean's time off to testify in these cases.

### 3. Manager Criticism

Plaintiff alleges that Duane Wehking, his manager, retaliated against him by criticizing him for not giving advance notice of his absence to attend depositions on September 17, 2001. Plaintiff did not learn of the deposition until the evening of September 16, 2001. Plaintiff called Wehking the morning of the deposition, 15 minutes before his shift was to begin. Wehking told plaintiff to go ahead and take the time off even though the department was behind in its work. Later that morning Wehking paged plaintiff. Plaintiff called him during a break, and Wehking asked him a question. Later that evening, plaintiff called Wehking at home and told him that he was disappointed that Wehking had called during the deposition. Wehking apologized and said that he had looked at the statistics for their group and was in a bad mood. Plaintiff had no reason to disbelieve Wehking. Plaintiff also apologized to Wehking, agreeing that ten

minutes was not enough notice for time off. Wehking did not discipline plaintiff.

### 4. Target For Termination

Plaintiff contends that Boeing has targeted him for termination because he opposed the *Williams* settlement. Beverly Trotter, an African American non-managerial employee, told plaintiff that Marcell Fleming, an African American employee, told McClam–Brown and Roseborough that after the *Williams* case and plaintiff's case were over, Boeing planned to "take care" of plaintiff and the "Wichita hold-ups" who opposed the *Williams* settlement. Plaintiff's Depo. at 729–30.

Boeing has not demoted plaintiff, decreased his pay, terminated his employment or given him a WARN notice, layoff notice or any other notice that his employment will be terminated. By the end of next year, Boeing plans to lay off about 5,000 of some 17,500 employees in Wichita. In accordance with the collective bargaining agreement, Boeing has recently conducted a retention exercise. In the exercise, employees are ranked as retention level 1, 2 or 3. Retention 3 level employees are laid off first, followed by retention level 2 and then retention level 1. Plaintiff was ranked retention level 1.[20]

### Analysis

Plaintiff claims that defendant discriminated against him on account of his race by (1) not promoting him to system config-

uration specialist 2 in June 1994, and (2) paying him less than white employees from October 1994 to the present. In addition, plaintiff asserts that defendant retaliated against him because he complained about discrimination and filed this lawsuit. Defendant maintains that it is entitled to summary judgment on the grounds that (1) the statute of limitations bars plaintiffs claims for failure to promote and disparate pay before February 1997; (2) plaintiff cannot establish a prima facie case of discrimination; (3) plaintiff cannot show that defendant's reasons for its alleged discriminatory actions are pretextual; (4) plaintiff cannot establish a prima facie case of retaliation; and (5) plaintiff cannot show that defendant's reasons for its alleged retaliatory actions are pretextual.

### I. Statute Of Limitations

Defendant asserts that the statute of limitations bars plaintiff's claims for failure to promote in 1994 and disparate pay before February 1997. The Court agrees, and plaintiff does not argue otherwise. In its last order, the Court ruled that plaintiff's Section 1981 claims are limited to actions which occurred in or after February 1997, at the earliest. *See Memorandum And Order* (Doc. # 141) at 11.[21] Plaintiff claims that defendant discriminated against him on the basis of race when it promoted Bellew and Zehr to the system configurations specialist positions

20. Plaintiff asserts that his retention level has changed from 1 to 2, but his affidavit does not support the contention. *See Plaintiff's Memorandum* at ¶¶ 160–61, Exhibit X.

21. In addressing defendant's motion for partial summary judgment the Court on October 4, 2001, found that a two-year statute of limitations limited plaintiff's claims to acts which occurred on or after February 1998, but that plaintiff had created a fact issue as to whether his claims should be equitably tolled for ap-

proximately one year, back to February 1997. *See id.* at 9–11. In its current motion, defendant asks the Court to reconsider its ruling for employment actions which occurred between February 1997 and September 27, 1997 based on the "more complete record." *See Defendant's Memorandum* at 49 n. 7. Defendant does not clearly articulate the basis for its assertion. *See id.* In any event, as discussed below, the Court finds that defendant is entitled to summary judgment on all claims.

in 1994. Because the failure to promote occurred well before February 1997, defendant is entitled to summary judgment on this claim. In addition, based on the Court's previous order, plaintiff's disparate pay claim is barred to the extent it is based on acts which occurred before February 1994.

## II. Race Discrimination Claim Based On Unequal Pay

Plaintiff claims that defendant discriminated against him on the basis of race by paying him less than similarly situated white employees. Because plaintiff relies on indirect evidence to demonstrate Boeing's discriminatory intent, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[22] Under this approach, plaintiff initially bears the burden of production to establish a prima facie case of unequal pay. *See id.* at 802, 93 S.Ct. 1817. To carry this burden plaintiff must show that (1) he belongs to a protected class; and (2) defendant compensated a co-worker outside his protected class, performing similar work, at a higher rate. *See Amro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir.2000) (citing *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir.1997) (discussing elements for Title VII gender-based discriminatory pay claim)).

Viewed in a light most favorable to plaintiff, the record supports a finding that Bellew, Zehr, Martin and Lyon were similarly situated to plaintiff. They all worked as system configuration specialists, and they all performed work at the grade 51 level. With respect to Bellew and Zehr, the record establishes an inference that defendant treated them more favorably with respect to salary. From February 1997 to February 27, 1998, plaintiff earned $4,750 less than Bellew and $7,250 less than Zehr.[23] While it is not clear whether this difference was a lag result of their earlier promotions in June 1994, *see United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (present effects of past employment decisions do not present separate claims), the Court finds that plaintiff has presented a prima facie case for purposes of defendant's motion for summary judgment.[24]

Because plaintiff has established a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions. *See Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1533 (10th Cir.1995). Defendant asserts that the pay differences re-

---

**22.** Although *McDonnell Douglas* involved Title VII, its analysis applies equally to Section 1981 claims. *See Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir.1999), *cert. denied*, 529 U.S. 1110, 120 S.Ct. 1964, 146 L.Ed.2d 796 (2000).

**23.** In February 1997, defendant promoted Bellew to grade 51 and increased his salary to $36,200. At the time, Zehr earned $33,600 and plaintiff earned $28,950. In April 1997, defendant raised Zehr's salary to $35,100 and plaintiff's salary to $30,350. In October 1997, defendant increased Zehr's pay to $36,200.

**24.** With respect to Lyon and Martin, the record is less clear. Until February 27, 1998, plaintiff earned more than either Lyon or Martin. In addition, although plaintiff received his promotion to grade 51 at a later date, defendant implemented it retroactively to February 27, 1998, the date on which Lyon and Martin had received their promotions. Perhaps plaintiff could argue that defendant treated him less favorably between October 1997 and February 27, 1998, when it demoted Martin and Lyon to lower grade job responsibilities while plaintiff continued to perform grade 51 level work—but plaintiff does not do so. In any event, as explained below, even if plaintiff established a prima facie case, he has not presented sufficient evidence of pretext.

sulted from different decisions by different line managers regarding SELA fund allocations. In addition, defendant contends that although many employees earned less than they deserved, Johnson made sure that Lyon and Martin received promotions in February 1998 because he had become personally involved in their situations after they complained to him. While defendant's actions may not have been fair to all employees, it has stated facially legitimate, nondiscriminatory reasons for its actions. The burden thus shifts to plaintiff to present evidence sufficient for a reasonable jury could conclude that defendant's proffered nondiscriminatory reason is pretextual, that is, "unworthy of belief." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995)). Plaintiff may show pretext by showing either that a discriminatory reason more likely motivated defendant or that defendant's proffered explanation in unworthy of credence. *See Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir.1994).

Plaintiff acknowledges this standard, but he makes no attempt to show that the facts meet it. Plaintiff merely sets forth multiple pages of cases in which courts have found evidence of pretext—he does not argue how the facts in this case establish pretext. The Court will not sift through the record in attempt to construct plaintiff's arguments or theories. *See, e.g., Schunk v. United Fin. Mortgage Co.*, No. 00–2137–KHV, 2001 WL 474299, at *4 n. 12 (D.Kan. April 11, 2001) (citing *Scott v. Hern*, 216 F.3d 897, 910 n. 7 (10th Cir. 2000)). As a practical matter, however, the Court discerns no evidence of pretext in this case.

Evidence of pretext may take a variety of forms. *See Aramburu v. Boeing*, 112 F.3d 1398, 1411 n. 10 (10th Cir.1997). Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, incon-

sistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (quotations omitted). Typically, a plaintiff demonstrates pretext with evidence that (1) defendant's stated reason for the adverse action was false; (2) defendant acted contrary to written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse decision. Plaintiff presents no such evidence here. At most plaintiff cites the unflattering remark by Korphage that he told Lyon and Martin to keep their mouths shut regarding their promotions. This statement suggests that defendant attempted to hide the promotions from other employees, but it does not support an inference that defendant's stated reason is false or that it acted contrary to its policies or practice. Indeed, Korphage directed plaintiff not to discuss his own promotion with co-employees. Accordingly, defendant is entitled to summary judgment on plaintiff's race discrimination claims.

### III. Retaliation Claim

Plaintiff asserts that defendant (1) threatened to take away his grade 51 job duties; (2) reprimanded him for sending a Christmas e-mail in December 2000; (3) failed to pay him to attend depositions in this case; (4) criticized him for not giving advance notice of time off; and (5) targeted him for termination, all in retaliation for his complaints of discrimination and filing this lawsuit. In order to establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination; (2) defendant subjected him to adverse employment ac-

tion; and (3) a causal connection exists between the adverse employment action and his protected activity. *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir.1998).

As a preliminary matter, plaintiff cites no evidence that defendant has targeted him for termination. He cites only hearsay statements that Trotter told plaintiff that Fleming told McClam–Brown that defendant planned to "take care" of plaintiff. Such statements are inadmissible hearsay and do not create a genuine issue of fact for summary judgment purposes. *See Jeffries v. State of Kan.*, 147 F.3d 1220, 1224 n. 1 (10th Cir.1998).

■ With respect to his claim of manager threats and criticism, plaintiff does not allege an adverse employment action. Although the Tenth Circuit liberally defines adverse employment action, it "does not extend to a mere inconvenience or an alteration of job responsibilities." *Sanchez*, 164 F.3d at 532 (citations and quotations omitted). More specifically, oral reprimands and derogatory comments do not constitute adverse employment actions absent evidence that they had some impact on the employee's employment status. *See id.* at 533. Plaintiff has not shown that the threats and criticism had a negative impact on his employment status. Thus plaintiff has not established that such action constitutes adverse employment action.

■ Similarly, plaintiff has not shown that his reprimand for the Christmas e-mail constitutes adverse employment action. As discussed above, Skaggs' oral reprimand is not sufficient. *See id.* at 533. Even if Montgomery's call detail report constituted a disciplinary record, as plaintiff contends, he has not shown that it was significant enough to change his employment status. *See, e.g., Robleado v. Deffenbaugh Indus. Inc.*, 136 F.Supp.2d 1179, 1189–90 (D.Kan.2001) ("write-ups" kept in supervisor's file and not in personnel file not adverse employment action).

■ With respect to plaintiff's allegations regarding paid time off, it appears that plaintiff has produced evidence sufficient to establish a prima facie case. Filing this lawsuit constitutes protected opposition to discrimination. *See, e.g., Caban v. Sedgwick County Sheriff's Dept.*, No. 98–1196–CM, 2001 WL 487905, at *22 (D.Kan. April 19, 2001) (defendant concedes filing Title VII lawsuit protected activity). In addition, treating employees differently with respect to paid time off may constitute adverse employment action. *See Hayes v. Shalala*, 933 F.Supp. 21, 27 (D.D.C.1996) (defendant retaliated by charging one hour of absence without leave). Finally, the fact that the time off was to attend depositions in this case justifies an inference of retaliatory motive. *See Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (plaintiff may demonstrate causal connection with evidence of circumstances that justify inference of retaliatory motive).

■ Defendant, however, articulates legitimate nondiscriminatory reasons for its action. Under the union's collective bargaining agreement, defendant has agreed to pay for employees to attend legal proceeding in support of Boeing. The undisputed facts establish that Boeing only paid for employees to oppose its interests on one occasion: when McClam–Brown and Roseborough attended the mediation conference in *Williams*. Because the purpose of the meeting was to resolve their differences, defendant decided that its interest included having them attend. Plaintiff does not assert that Boeing refused to pay for him to attend a mediation in this case, nor has he shown that defendant's explanation is pretextual. Accordingly, defendant is entitled to summary judgment on plaintiff's retaliation claims.

**IT IS THEREFORE ORDERED** that *Defendant's Motion For Summary Judgment* (Doc. # 148) filed October 17, 2001 be and hereby is **SUSTAINED.**