Dr. Cynthia A. ANNETT, Ph.D., Plaintiff,

v.

UNIVERSITY OF KANSAS, Defendant.

No. 01–2367–JAR.

United States District Court, D. Kansas.

Sept. 4, 2002.

---

Alan V. Johnson, Stephen D. Lanterman, Sloan, Listrom, Eisenbart, Sloan & Glassman, Topeka, KS, for Plaintiff.

Rose A. Marino, Barbara L. McCloud, Office of the General Counsel, Lawrence, KS, for Defendant.

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROBINSON, District Judge.

This matter is before the court on Defendant's Motion for Summary Judgment (Doc. 31), brought pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Plaintiff has filed a Response (Doc. 35), and defendant has filed a Reply to plaintiff's response (Doc. 39). In addition to the above filings, plaintiff has filed a Motion for Leave to File a Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 40). Defendant filed a Memorandum in Opposition to plaintiff's motion (Doc. 41). Plaintiff's complaint alleges violations under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Specifically, plaintiff alleges defendant unlawfully retaliated against her for exercising her rights pursuant to Title VII.

## I. BACKGROUND

The following facts concerning plaintiff's claims are either uncontroverted or, if controverted, are construed in a light most favorable to plaintiff.

In August of 1992, plaintiff, Dr. Cynthia Annett, Ph.D. ("plaintiff"), began employment as an Assistant Professor, tenure track, at the University of Kansas ("University").[1] In March of 1998, plaintiff was denied promotion and tenure, and she was advised that her employment with the University would be terminated. At that time, plaintiff was issued a terminal contract, indicating that her employment would terminate at the end of the 1998/1999 school year.

In February of 1999, plaintiff filed a lawsuit against the University claiming the denial of tenure and subsequent termination were motivated by discriminatory and retaliatory motives. For purposes of discovery, plaintiff deposed Chancellor Robert Hemenway, Provost David Shulenburger, Dr. Maria Carlson, and Maurice Bryan, Director of the University's Equal Opportunity Office ("EOO"). These individuals also testified at trial which began February 14, 2000, and culminated with a

---

**1.** The court will use the terms "defendant" and "University" interchangeably when referring to the defendant, University of Kansas.

verdict unfavorable to plaintiff on March 3, 2000. Post-trial motions continued into June of 2000.

While plaintiff's lawsuit was pending, Dr. Carlson, acting as a Principal Investigator ("PI"), submitted a grant to USAID that listed plaintiff as "Project Coordinator" and "Co–Principal Investigator" ("Co–PI"). In July of 1999, Dr. Carlson requested that plaintiff be appointed to the position of Adjunct Assistant Professor so that she may be able to continue as Project Coordinator and Co–PI on the USAID grant. Later in the month of July, Provost Shulenburger approved Dr. Carlson's request in part, and appointed plaintiff as an Adjunct Lecturer instead of as an Adjunct Assistant Professor. Plaintiff was again appointed Adjunct Lecturer in July of 2000.

Also, while plaintiff's lawsuit was pending, plaintiff applied for Principal Investigator ("PI") status at the University. As explained below, exactly how plaintiff applied for PI status and what type of PI status she applied for is either controverted or unclear from the record before the Court. Plaintiff does not claim that the University directly denied her PI status. Instead, plaintiff claims that Dr. Carlson led her to believe she was not eligible for any type of PI status, even though she was in fact eligible for "special" or "project" PI status. Plaintiff claims that based on her conversation with Dr. Carlson, she was effectively denied PI status.

In April of 2000, plaintiff, along with more than fifty other individuals, applied for a position as the Assistant Director of EOO at the University. Two of the members of the committee charged with hiring the Assistant Director of the EOO initially rated plaintiff higher than or equal to Gwen Jansen, the individual who eventually got the job. While the committee was discussing the applicants, one of the committee members commented that plaintiff "may be strong but would she be for KU." (Pl.Ex. 16). Also, during the discussion, one committee member asked if plaintiff had filed a lawsuit against the University. (Pl.Ex. 16; Dempsey–Swopes Dep. at 94).

On May 11, 2000, plaintiff was notified that she would not be granted an interview for the Assistant Director position. On June 12, 2000, the director of the EOO, Mr. Bryan, sent a letter to plaintiff explaining how the new Assistant Director was chosen and why Ms. Jansen, in particular, was chosen. (Pl.Ex. 10). The contents of the letter are more thoroughly explained below.

Prior to plaintiff's application for the Assistant Director position, plaintiff along with Mike Cuenca, visited the EOO in preparation for writing a report regarding the status of women and minorities at the University. While visiting the EOO, plaintiff and Mr. Cuenca reviewed documents maintained by the EOO. Of particular interest, plaintiff obtained a copy of a "conciliation agreement" entered into by the University and the Office of Federal Contract Compliance Program ("OFCCP"). The OFCCP is a federal agency that enforces several federal equal opportunity laws, including Executive Order 11246, which requires affirmative action programs for federal contractors,[2] and Section 503 of the Rehabilitation Act of 1973. The conciliation agreement entered into by the University contained the following information:

1. VIOLATION: KU has violated the terms of the EEO/affirmative action

---

**2.** *See Loffland Bros. Co. v. Rougeau,* 655 F.2d 1031 (1981).

clause at 41 CFR 60–1.40(c) by failing to submit a summary of the results of its prior year [Affirmative Action Plan ("AAP") ].

REMEDY: On April 25, 1995, KU agreed to compile a report of the results of its affirmative action program annually. This will be included in future AAP's [sic].

2. VIOLATION: KU's record keeping is inadequate because the gender of minorities were not identified, for affirmative action purposes, in the applicant flow, hiring and promotion personnel activity data for the faculty, non-faculty (unclassified) and classified job groups. 41 CFR 60–2.12(m) and 41 CFR 60–3.4A and B.

REMEDY: On April 25, 1995, KU agreed to revise our procedures to include the gender of minorities in its future applicant flow, hiring and promotion data for the faculty, non-faculty (unclassified) and classified job groups.

3. VIOLATION: KU's identification of problem areas section of its AAP is inadequate because it failed to address the underutilization of minorities and females, and the corrective action it will take to correct the underutilization, by job groups. 41 CFR 60–2.13(d).

REMEDY: On April 25, 1995, KU agreed to address the underutilization of minorities and females, and the corrective action it will take to correct the underutilization, by job groups in future AAP's [sic].

(Pl.Ex. 22).

When plaintiff asked for documentation concerning compliance with the conciliation agreement, Danielle Dempsey–Swopes, Assistant Director of the EOO, provided the requested documentation to plaintiff and explained in a hand-written note, "these numbers are incorrect due to data transfer problems." (Dempsey–Swopes Dep. at. 31–32; Pl.Ex. 13). After reviewing the data, plaintiff alleges that she and Mr. Cuenca expressed their opinion to Mr. Bryan and Ms. Dempsey–Swopes that the records indicated that the EOO was not complying with the conciliation agreement.

On September 6, 2000, plaintiff filed an administrative charge with Equal Employment Opportunity Commission ("EEOC") claiming the University failed to hire her as the Assistant Director of the EOO and failed to grant her PI status in retaliation for filing and pursuing her first lawsuit. On or about May 1, 2001, plaintiff received a "Dismissal and Notice of Rights" letter from the EEOC wherein it advised plaintiff of her right to sue. Plaintiff filed the case currently before the Court on July 26, 2001.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." [3] There is a "genuine" issue of material fact if a reasonable jury could return a verdict for the nonmoving party.[4] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of

---

**3.** Fed.R.Civ.P. 56(c).

**4.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

law." [5]

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. This may be met by showing that there is a lack of evidence to support the nonmoving party's case.[6] Once the moving party properly supports its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[7] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." [8] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[9] The Court must consider the record in the light most favorable to the nonmoving party.[10]

## III. DISCUSSION

Plaintiff's complaint alleges that defendant unlawfully retaliated against her for exercising her rights under Title VII. Title VII makes it unlawful to retaliate against an employee for participating in certain protected activity, including opposing dis-

5. *Id.* at 251–52, 106 S.Ct. 2505.

6. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

7. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

8. *Id.*

9. *See id.*

10. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984).

11. *See* 42 U.S.C. § 2000e–3(a).

crimination made unlawful by Title VII or participating in any Title VII proceeding.[11] Plaintiff claims defendant retaliated against her in the following three manners: (1) by denying her PI or Co–PI status; (2) by appointing her to a position as an Adjunct Lecturer, rather than as an Adjunct Assistant Professor; and (3) by failing to hire her as Assistant Director of the EOO.

Title VII retaliation claims proceed under the familiar *McDonnell Douglas* [12] burden shifting analysis.[13] Under the *McDonnell Douglas* framework, the plaintiff must first present a prima facie case of retaliation.[14] Then, the burden of production shifts to the defendant to produce a legitimate, non-discriminatory justification for taking the action in question.[15] Finally, the burden is redirected at the plaintiff to show the defendant's reason for its action was merely a pretext for discrimination.[16] The University argues that plaintiff can not establish a prima facie case, and that she can not show that the University's proffered reasons for termination are a pretext for an actual retaliatory motive.

### A. Prima Facie Case

To establish a prima facie case of retaliation, plaintiff must show: (1) she engaged

12. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

13. *See McGarry v. Bd. of County Comm'rs,* 175 F.3d 1193, 1201 (10th Cir.1999).

14. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

15. *Id.*

16. *Id.* at 804, 93 S.Ct. 1817.

in protected opposition to discrimination or participated in a proceeding arising out of discrimination; (2) she was subjected to adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.[17]

### 1. Protected Activity

Plaintiff argues that she engaged in two instances of protected activity: first, when she filed and pursued her initial Title VII lawsuit; and, second, when she expressed concern to individuals in the EOO office that their records were not in compliance with the conciliation agreement entered into by the University and the OFCCP.

### a) Initial Lawsuit

Plaintiff argues that her first instance of protected activity was filing and pursuing her initial lawsuit against the University.[18] As mentioned above, plaintiff filed a lawsuit against defendant, alleging gender discrimination and retaliation, in February of 1999. After a jury trial in March of 2000, a verdict was returned in favor of defendant. Post-trial motions continued into June of 2000.

In its motion for summary judgment, defendant contends that only the filing of the lawsuit was a protected activity and the subsequent discovery process and trial were not. In its reply brief, however, defendant abandons this argument stating that it does not dispute that plaintiff's participation in her previous litigation constitutes participation in a Title VII proceeding. (Doc. 39 at 10). The court finds that plaintiff has met her burden as to the first element of the prima facie case by showing she engaged in a protected activity by filing and pursuing her initial Title VII claim against the University.[19]

### b) EOO Complaints

■ Plaintiff also contends that she engaged in a protected activity when, in April of 2000, she complained to EOO Director, Mr. Bryan, and Assistant Director of the EOO, Ms. Dempsey–Swopes, that the EOO was out of compliance with the conciliation agreement entered into by the University and the OFCCP. According to plaintiff, she and Mr. Cuenca went to the EOO office and reviewed documents relating to the conciliation agreement. After reviewing the documents, plaintiff avers that she and Mr. Cuenca represented to Ms. Dempsey–Swopes and Mr. Bryan that the University was not in compliance with the conciliation agreement. Specifically, plaintiff contends that the documentation indicated that the University failed to compile annual reports of its Affirmative Action Plan, failed to maintain adequate records concerning gender and minority status in applicant flow data, and failed to take action to correct underutilization of minorities and women in certain job categories. (Pl. Dep. at 94–95).

Plaintiff alleges that by expressing her belief to individuals in the EOO office regarding the alleged failure to comply with

---

**17.** *Kendrick v. Penske Trans. Servs., Inc.,* 220 F.3d 1220, 1234 (10th Cir.2000).

**18.** *See Biglow v. Boeing Co.,* 182 F.Supp.2d 1037, 1054 (D.Kan.2001) (filing a lawsuit claiming violations to Title VII is a protected opposition to discrimination).

**19.** *See Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545 (10th Cir.1999) (holding that firing plaintiff one month after his deposition in a Title VII case is sufficient to show a retaliatory motive for the firing).

the conciliation agreement, she was opposing Title VII discrimination. As mentioned previously, Title VII prohibits retaliation against an employee because he or she "has opposed any practice made an unlawful employment practice by" Title VII.[20] Title VII prohibits discrimination on the grounds of race, color, religion, sex, or national origin.[21] The Court fails to see how making complaints regarding proper record-keeping in the EOO constitutes "opposing" a practice made unlawful by Title VII.

Plaintiff seems to argue that because complaints filed with the OFCCP and complaints filed pursuant to Title VII are both covered under the jurisdiction of the EEOC, that complaints filed with the OFCCP are complaints opposing a practice made unlawful by Title VII. The Court rejects plaintiff's argument and finds that plaintiff has failed to show that making complaints regarding the University's compliance with the conciliation agreement is a protected activity.

### 2. Adverse Employment Action

Next, plaintiff must show she was the victim of an adverse employment action constituting " 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' "[22] Plaintiff claims she was the victim of three instances of adverse employment action. First, it is uncontested that the University's failure to hire plaintiff as Assistant Director of the EOO is an adverse employment action.[23] Second, plaintiff claims the University's failure to grant her PI status or Co–PI status constitutes an adverse employment action. Finally, plaintiff claims she was subject to an adverse employment action when the University appointed her as an Adjunct Lecturer instead of as an Adjunct Assistant Professor. The Court will take plaintiff's second and third instances of adverse employment action in turn.

### a) PI or Co–PI Status

Plaintiff contends that she was denied PI status in the spring or summer of 1999 and that such denial was an adverse employment action because it eliminated her ability to support her career with "soft money" from grants. Before delving into whether denial of PI or Co–PI constitutes adverse employment action, the Court must first endeavor to explain some concepts relating to this matter and briefly discuss some facts.

PI or Co–PI status denotes the ability of an individual to act as director or co-director on a "sponsored project application." A sponsored project application is an application for grant money to support a particular research or service project. According to the affidavits submitted by the parties, some sponsored projects include a salary for individuals working on the project. This salary is otherwise known as "soft money."

Pursuant to a written University policy, only individuals who are regular faculty,

---

**20.** 42 U.S.C. § 2000e–3(a).

**21.** *See* 42 U.S.C. §§ 2000e *et seq.*

**22.** *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532 (10th Cir.1998) (quoting *Burlington In-*
*dus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

**23.** *See id.* (holding that failure to hire is an adverse employment action).

academic staff, or research associates are entitled to automatic PI or Co–PI status. (Def.Ex. 16). Those who are not entitled to automatic PI or Co–PI status must follow a procedure to achieve "special" or "project" PI status. (Pl.Ex. 16). To achieve special PI status, the sponsoring unit, such as a department, unit, or school, must make "a written request to the Vice Chancellor for Research · and Graduate Studies." (Def.Ex. 16). The request must include a copy of the individual's vita and a statement from the sponsoring unit indicating that the individual "possesses the expertise to hold special PI status and that the department agrees to support and house any project awarded under the PI's direction." (Def.Ex. 16). The procedure for requesting project PI status is substantially similar.

It is undisputed that the positions of Adjunct Lecturer and Adjunct Assistant Professor do not carry with them automatic PI or Co–PI status. Those positions, however, do carry with them eligibility for special or project PI status. Thus, for plaintiff to have achieved special or project PI status, the only PI status available to her, she would have had to follow the procedures set forth above.

Plaintiff contends that in the spring of 1999, she applied for PI status through Dr. Carlson. Defendant denies plaintiff's contention, but points out that it is uncontroverted that plaintiff was given the position of Adjunct Lecturer so she could continue as Co–PI on the USAID grant. There is no evidence, other than plaintiff's own testimony, indicating that plaintiff did in fact apply for PI status. It is also unclear from plaintiff's deposition testimony whether she was attempting to apply for regular PI status, which she was not eligible for; or, whether she was attempting to apply for

special or project PI status. To support her contention that she applied for PI status, plaintiff points to the following language from her deposition:

Answer: The status that I was given as principal investigator. I had applied through her for principal investigator status—I'm trying to remember when, whether or not it was before the trial, but I believe I requested it before my termination and there was a long process involved in granting it, so in our conversations she led me to believe that after review by the Provost this was going to be the best situation I was going to be able to obtain.

Question: And what situation was that?

Answer: That was, I believe I'm formally an adjunct lecturer without principal investigator status.

Question: Other than applying for PI—did you apply by a letter, did you send a letter to Maria saying "I want PI status?"

Answer: I don't remember what materials she asked me for. I know that typically it requires a review of a CV so I don't know if I was required to write a letter or if it was something by cover letter from her, because we had discussed in conversation.

(Pl. Dep. at 56–57).

For the purpose of this analysis, and viewing the evidence in the light most favorable to plaintiff, the Court will assume that plaintiff did in fact apply for some type of PI status. According to plaintiff's deposition, affidavit, and pleadings, after she applied for PI status, Dr. Carlson told her that she did not have regular PI or Co–PI status, but failed to mention to plaintiff that she was eligible

for special or project PI status. Plaintiff claims that Dr. Carlson's failure to tell her she was eligible for special or project PI status "effectively" denied her PI status and thus "effectively" prevented her from supporting herself through salary from grants. Plaintiff contends that if she would have been properly advised about her eligibility for special or project PI status, she would have submitted grant applications through the University.

The Court finds that Dr. Carlson's alleged failure to inform plaintiff that she was eligible for special or project PI status does not rise to the level of adverse employment action. Dr. Carlson's failure to mention plaintiff's eligibility for special or project PI status hardly qualifies as a significant change in employment status.[24] The University did not take any affirmative action against plaintiff. Plaintiff merely assumed, after her conversation with Dr. Carlson, that she was ineligible for any type of PI status. While it is true that the Court should liberally define adverse employment action,[25] to construe Dr. Carlson's alleged omission as an adverse employment action is beyond reason.

Even in viewing the evidence in the light most favorable to plaintiff, no reasonable jury could find that Dr. Carlson's omission constitutes adverse employment action against plaintiff. At most, Dr. Carlson's alleged failure to inform plaintiff that she was eligible for project or special PI status can be considered a mere inconvenience to plaintiff because it would have forced plaintiff to investigate the policies regarding PI status to learn that she was, in fact, eligible for special or project PI status. Because mere inconvenience does not constitute adverse employment action, plaintiff has failed to meet her burden.[26]

### b) Adjunct Lecturer and Adjunct Assistant Professor

■ Lastly, plaintiff claims she suffered an adverse employment action when she was appointed to the position of an Adjunct Lecturer instead of the position of an Adjunct Assistant Professor. Plaintiff claims that the appointment adversely affected her ability to obtain compensation from grants because the amount of salary paid from a grant is based upon the salary of a comparable position at the supporting educational facility. Thus, according to plaintiff, she could have only obtained compensation comparable to that of a lecturer, not that of an assistant professor. Defendant controverts plaintiff's allegations regarding compensation noting that plaintiff's allegations are her own conclusory perceptions, unsupported by evidence.

The Court finds that the Tenth Circuit case, *Aquilino v. University of Kansas,*[27] is dispositive on this issue. In *Aquilino,* plaintiff claimed that the defendant's decision to deny her an adjunct research associate position was an adverse employment action because it deprived her the opportunity to pursue an alternative career path as a private scholar and support herself through grants and other awards. Plain-

---

**24.** *See Burlington,* 524 U.S. at 761, 118 S.Ct. 2257 (holding that conduct is adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

**25.** *Sanchez.,* 164 F.3d at 532.

**26.** *Id.*

**27.** 268 F.3d 930 (10th Cir.2001).

tiff argued that lack of adjunct status limited the number of national grants for which she was eligible because many grants require university affiliation. The defendant contended that plaintiff presented no evidence for her claim except her own conclusory opinion.

The court found plaintiff's claim rested on her own untested beliefs that she could support herself as a private academic, and that such, "speculative harm does not constitute adverse employment action."[28] In so deciding, the court found that plaintiff did not provide evidence, other than her own opinion, that such an alternative career path was feasible. The court noted that plaintiff did not present expert testimony supporting her contentions, nor did she show that other academics had supported themselves in a similar manner after being denied tenure.

Likewise, in this instance, plaintiff's entire argument rests on her stated belief that if she applied for grants, and if they included "soft money," then according to industry standards, plaintiff would only be entitled to compensation equal to that of a lecturer. Plaintiff's proposed scenario is most certainly speculative. Further, plaintiff, like the plaintiff in *Aquilino*, presents no evidence, other than her own testimony, supporting her contention that she could make more money as an Adjunct Assistant Professor than she could as an Adjunct Lecturer. Thus, the Court finds that plaintiff has not shown that she suffered an adverse employment action when she was appointed to the position of Adjunct Lecturer instead of Adjunct Assistant Professor.

### 3. Causal Connection

To establish the third element of the prima facie case, plaintiff must show a causal connection existed between the protected activity and the adverse employment action. Having determined that the only adverse employment action suffered by plaintiff was the University's failure to hire her as the Assistant Director of the EOO, plaintiff must show that there was a causal connection between that adverse employment action and pursuance of her initial lawsuit.

■ Plaintiff was denied an interview for the Assistant Director position in May of 2000. Meanwhile, her previous lawsuit culminated with a jury verdict in favor of defendant in March of that same year, with post trial motions continuing into June of 2000. Protected activity closely followed by adverse action may support an inference of causal connection.[29] The Court finds that the close proximity between trial in plaintiff's first lawsuit against defendant, which constituted participation in a Title VII proceeding, and the refusal to hire plaintiff as the Assistant Director of the EOO is sufficient to establish a causal connection for the purpose of plaintiff's prima facie case.

### B. Facially Nondiscriminatory Justification for Failure to Hire

■ Because plaintiff has established her prima facie case, the burden now shifts

---

**28.** *Id.* at 936 (citing *Trimmer v. United States Dep't of Labor,* 174 F.3d 1098, 1103–04 (10th Cir.1999)).

**29.** *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1320 (10th Cir.1999). *See also* *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (assuming that temporal proximity of two months and one week is sufficient to support a prima facie case of retaliation).

to defendant to proffer a non-discriminatory reason for its decision not to hire plaintiff for the position as Assistant Director of the EOO. Defendant offers the following reasons for its decision not to hire plaintiff as the Assistant Director:

1) Plaintiff had not held a similar administrative position prior to her application. Instead, her prior experience consisted of being a faculty member and research scientist. (Def. Ex. 7; Dempsey–Swopes Aff. at 2; Ramirez Aff. at 2; Eason Aff. at 2; Villeareal Aff. at 2; and Gilliand Aff. at 2).

2) Plaintiff admits her field is that of an environmental scientist and statistician. (Def. Ex. 21; Pl. Dep. at 9).

3) Plaintiff had not previously held positions in affirmative action, equal opportunity, or human resources; and had not had any administrative experience in the facilitation, coordination or monitoring of the recruitment process. (Def. Ex. 7; Dempsey–Swopes Aff. at 2; Ramirez Aff. at 2; Eason Aff. at 2; Villeareal Aff. at 2; and Gilliand Aff. at 2).

4) Plaintiff's cover letter was at odds with her vita, in that her cover letter spoke of experience that her vita did not reflect. (Def. Ex. 7; Dempsey–Swopes Aff. at 2; Ramirez Aff. at 2; Eason Aff. at 2; Villeareal Aff. at 2; and Gilliand Aff. at 2).

5) All persons chosen for an interview had some direct administrative experience with coordinating, directing or conducting the personnel recruitment function. (Def. Ex. 9, 10, 11, 12, 13; Dempsey–Swopes Aff. at 3; Ramirez Aff. at 3; Eason Aff. at 3; Villeareal Aff. at 3; and Gilliand Aff. at 3).

6) The person chosen for the position had fourteen years experience with coordinating the recruitment function as well as other relevant experience. (Def. Ex. 10, Bryan Aff. at 3; Dempsey–Swopes Aff. at 3; Ramirez Aff. at 3; Eason Aff. at 3; Villeareal Aff. at 3; and Gilliand Aff. at 3).

Plaintiff does not dispute that defendant has proffered a facially non-discriminatory reason for its decision not to hire her as the Assistant Director of the EOO. The Court finds defendant has met its burden.

## C. Pretext

 Because defendant has proffered a nondiscriminatory reason for not hiring plaintiff as the Assistant Director of the EOO, the burden now shifts to plaintiff to demonstrate that the reasons given by the defendant are pretextual. Plaintiff can meet her burden by showing "that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief." [30]

When reviewing plaintiff's evidence of pretext, the Court examines facts "as they appear to the person making the decision" that adversely affected plaintiff.[31] Additionally, the Court may not second guess the business judgment of the employer.[32] Finally, " 'mere conjecture that the employer's explanation is pretext for intentional discrimination is an insufficient basis

---

**30.** *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995).

**31.** *Kendrick,* 220 F.3d at 1231.

**32.** *Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Services,* 165 F.3d 1321, 1330 (10th Cir.1999).

for denial of summary judgment.' " [33]

Plaintiff has presented four pieces of evidence in an attempt to establish that defendant's proffered reasons for not hiring her as Assistant Director of the EOO are pretext for unlawful retaliation. First, plaintiff argues that the temporal proximity between the trial in her initial lawsuit and the time in which she was declined the position as the Assistant Director is evidence of pretext. While it is true that close proximity between a protected activity and an adverse employment action is a factor in determining whether the defendant's proffered reason is a pretext for retaliation,[34] it is not, by itself, sufficient to raise an issue of fact.[35] Thus, it must be determined whether plaintiff offers additional evidence of pretext.

Plaintiff also contends that comments made by the search committee during its discussion of the applicants for the Assistant Director position are evidence of pretext. Plaintiff first points to the fact that her first lawsuit was mentioned. Plaintiff relies on the following text from Ms. Dempsey–Swopes' deposition:

Question: Do you remember people in the round-table discussion talking about Doctor Annett's prior lawsuit against KU?

Answer: Sandy Gilliland asked if she was the person who had filed a lawsuit.

Question: And what was the response on that?

Answer: That she was.

Question: And was there some concerns that because Doctor Annett had filed

the lawsuit she might not be the best candidate?

Answer: No, not at all.

(Dempsey–Swopes Dep. at 94–95). The questioning continued as follows:

Question: Now, you noted that—in your notes that Doctor Annett was involved with litigation. Why did you make a specific note of that?

Answer: I believe that's the—the time Sandy was asking—she was saying, you know, who is this woman? I've heard this name before. Is this the person who's filed the lawsuit? And we said, yes, it is.

Question: Okay.

Answer: Uh-huh.

Question: Did you discuss the lawsuit beyond that?

Answer: No, other than Sandy noted on the vita that she didn't have tenure?

(Dempsey–Swopes Dep. at 96).

As evidence of pretext, plaintiff also points to a note taken by one of the committee members that says, "may be strong but would she be for KU." (Pl.Ex. 16). It is not known which committee member wrote this note and there is no evidence that a discussion took place among the committee members concerning whether plaintiff was "for KU." In fact, Ms. Dempsey–Swopes testified in her deposition that she did not recall any conversation amongst committee members to this effect. (Dempsey–Swopes Dep. at 95). Ms. Dempsey–Swopes was asked the following

**33.** *Morgan v. Hilti,* 108 F.3d 1319, 1323 (10th Cir.1997) (quoting *Branson v. River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988))..

**34.** *Pastran v. K–Mart Corp.,* 210 F.3d 1201, 1206 (10th Cir.2000) (citing *Medlock v. Ortho*

*Biotech. Inc.,* 164 F.3d 545, 551 (10th Cir. 1999)).

**35.** *Id.*

question: "And you don't recall anyone expressing the opinion that Doctor Annett may not—may be a strong candidate, but she may not be for KU?" In response, Ms. Dempsey–Swopes testified, "[n]ot at all."

Defendant contends that plaintiff's evidence does not suffice to show pretext because the fact that plaintiff participated in the lawsuit was well known to the search committee members and yet plaintiff was still given high marks. The evidence on the record clearly indicates that, not only did plaintiff mention that she had experience with federal court trials in her application for the position, there were numerous newspaper articles regarding her previous lawsuit. (Def. Ex. 7 and 34; Pl. Dep. at 99–100). Defendant contends that if the search committee had planned to retaliate against plaintiff, they would not have rated her with high marks in the initial screening process.

The Court finds that neither of the comments made by the search committee members are evidence of pretext. First, asking whether a person filed a lawsuit for purposes of identification is insufficient as evidence of pretext. Mere knowledge that plaintiff filed and pursued a lawsuit does not provide an adequate basis to infer that the proffered reasons given by defendant are merely a pretext. This is true especially in light of the evidence that even though the committee was aware of plaintiff's lawsuit, the members gave plaintiff high marks. Second, questioning whether plaintiff was the right person for the job also does not demonstrate pretext. Certainly, that is a question that a search committee must ask of every applicant. Furthermore, there is no evidence that the issue was discussed in the committee meeting. Instead, it appears that it was a

private thought, taken out of context, from an unknown committee member's notes.

Plaintiff next contends that defendant's proffered reasons for not hiring her as the Assistant Director of the EOO consist of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that "a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." [36] As evidence of such "weaknesses, implausibilities, inconsistencies, and incoherencies," plaintiff points to the evidence that some members of the search committee initially rated plaintiff higher than the individual who eventually got the job. Plaintiff claims that three of the four "official" search committee members rated her higher than Ms. Jansen, the prevailing candidate.

After reviewing the evidence presented by plaintiff, the Court finds plaintiff's assertion is not supported by the evidence. First, plaintiff claims that the "official" search committee consisted of four members, yet the evidence in the record clearly indicates that there were six individuals on the search committee. Not only did six people complete screening instruments on the applicants, but all six persons on the search committee filed an affidavit stating that there were six persons on the committee. (Bryan Aff. at 2; Dempsey–Swopes Aff. at 2; Ramirez Aff. at 2; Eason Aff. at 2; Villeareal Aff. at 2; and Gilliand Aff. at 2). Of the six individuals on the committee, two of them rated plaintiff higher than Ms. Jansen. The ratings for plaintiff were as follows: Sandy Gilliland gave plaintiff a score of 18, Maurice Bryan gave plaintiff a score of 201, Nina Villeareal gave plaintiff a score of 151, Becky Eason gave plaintiff

**36.** *Morgan,* 108 F.3d at 1323 (citations and quotations omitted).

a score of 201, Danielle Dempsey–Swopes gave plaintiff a score of 110, and Steve Ramirez gave plaintiff a score of 202. (Pl. Ex. 14). The ratings for Ms. Jansen were as follows: Sandy Gilliland gave Ms. Jansen a total score of 20, Maurice Bryan gave Ms. Jansen a score of 249, Nina Villeareal gave Ms. Jansen a score of 282, Becky Eason gave Ms. Jansen a score of "not acceptable," Danielle Dempsey–Swopes gave Ms. Jansen a score of 102, and finally, Steve Ramirez gave Ms. Jansen a score of 247. (Pl.Ex. 15 and 24).[37]

Thus, based on the above evidence submitted by plaintiff, only two individuals rated Ms. Jansen higher than plaintiff. Also noteworthy is that all six members of the committee rated Verna Chapman–Lewis and Rodney Carr, two of the other individuals who received an interview, higher than plaintiff. Lanaea Heine, the other individual to receive an interview, was rated higher than plaintiff by four members of the committee. In sum, all four individuals who received an interview were rated higher than plaintiff and plaintiff has not presented any evidence indicating she was rated lower than the other candidates for retaliatory purposes.

This evidence hardly shows that defendant's explanation for not hiring or interviewing plaintiff was weak, implausible, inconsistent, incoherent or full of contradictions. In fact, it shows quite the contrary. The Court has reviewed the application materials submitted by plaintiff and the four individuals who received an inter-

view, and the scores given to plaintiff and the interviewees were quite consistent with the application materials. Plaintiff has presented no evidence indicating that the selection process for the Assistant Director position was anything other than a legitimate committee selection process.

Plaintiff's final evidence of pretext is that defendant's explanation for not hiring her is false.[38] As mentioned above, on June 12, 2000, Mr. Bryan sent a letter to plaintiff explaining why the interviewees were chosen for an interview and why Ms. Jansen ultimately was given the Assistant Director position. In his letter, Mr. Bryan explained the following:

> Each interview candidate's resume included work experiences and responsibilities that were similar to the duties required for this position. Each of the interviewees had direct experience facilitating unclassified searches within the university or at a State of Kansas agency, and worked previously in a position where it was his or her primary responsibility to coordinate recruitment or to serve as the lead administrator for the recruitment process.
>
> The position was offered to a White female. The candidate selected has over 14 years of administrative experience working with faculty to coordinate the recruitment process. The candidate hired also has significant data reporting skills and technical skills.

(Pl.Ex. 10).

Plaintiff claims that the reason given by Mr. Bryan's letter is false because Ms.

---

**37.** It is unclear from the documentation why the scores recorded by Ms. Gilliland are drastically different than the scores recorded by the other committee members. The court can only assume that Ms. Gilliland used her own scoring system. In any event, the court's analysis is not changed by the varying scoring systems.

**38.** *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that discriminatory motive can be inferred from the falsity of the employer's explanation).

Jansen testified in her deposition that her previous employment at the University did not involve facilitating any unclassified positions. The language in the deposition that plaintiff points to is as follows:

Question: When you were recruitment coordinator, did you ever serve in a search committee for a faculty member?

Answer: No.

Question: What about for a staff position?

Answer: We did not have any unclassified staff positions there. I was involved, though, in the process for the classified positions.

(Jansen Dep. at 48).

Defendant argues that Mr. Bryan's use of the term "unclassified" when comparing the qualifications of plaintiff and the other candidates cannot be considered a "false" explanation or an explanation in which defendant is "disassembling to cover up a discriminatory purpose."[39] The Court agrees with defendant. This small detail, compared with the overwhelming evidence corroborating the explanations given by Mr. Bryan's letter, is not enough to create a genuine issue of material fact.

The Court has reviewed the application materials of the four individuals selected for an interview and these materials substantiate the contents of Mr. Bryan's letter. The application materials presented by Mr. Carr, Ms. Jansen, Ms. Heine, and Ms. Chapman–Lewis clearly indicated they were each directly involved with personnel recruitment and hiring and they each had many years of administrative experience. (Def.Ex. 9, 10, 11, 12). Plaintiff's resume indicates she had no hiring, or administrative experience, and she certainly never held a position in which it was her primary responsibility to coordinate recruitment or serve as a lead administrator for the recruitment process. (Def.Ex. 7). Instead, based on the materials presented to the committee, plaintiff's experience consisted primarily of teaching and researching. (Def.Ex. 7). Plaintiff spends a great deal of time pointing to her deposition testimony where she explained that she actually had administrative and personnel recruitment experience. The experiences plaintiff describes in her deposition are not evident in her application materials and the Court may only examine the facts as they appeared to the committee members.[40] Based on the information presented to the search committee, the reasons given by Mr. Bryan in his letter to plaintiff cannot be considered false.

The arguments presented by plaintiff as evidence of pretext simply do not undermine the University's proffered reasons for its decision not to hire her. The evidence overwhelmingly supports defendant's proffered reasons for not hiring plaintiff for the Assistant Director position. The only substantial evidence plaintiff has shown as evidence of pretext is the temporal proximity between the University's decision not to hire her and the trial and post-trial motions in her previous lawsuit. As stated above, while temporal proximity may be sufficient to show a causal connection for purposes of the prima facie case, it is not enough to overcome the University's proffered reasons for not hiring plaintiff. Plaintiff has not presented any other evidence that would cause a reasonable fact finder to question the va-

**39.** *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097.

**40.** *Kendrick,* 220 F.3d at 1231.

lidity of the reasons. Because plaintiff cannot show defendant's proffered reasons for not hiring her as the Assistant Director of the EOO are a pretext for an actual retaliatory purpose, defendant's motion for summary judgment shall be granted.

### D. Motion for Leave to File Surreply

Plaintiff has filed a "Motion for Leave to File a Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment." The Court construes this pleading as motion for leave to file a surreply. Plaintiff's motion alleged that she is entitled to file a surreply because defendant's reply brief raised several new arguments for which she is entitled to respond. Defendant filed a memorandum in opposition to plaintiff's motion, denying plaintiff's allegation that it raised new arguments in its reply. While a surreply is typically not allowed,[41] the Court finds good cause to grant plaintiff's motion. In reviewing defendant's motion for summary judgment, the Court has considered the arguments contained in plaintiff's surreply.

### IV. CONCLUSION

The Court grants summary judgment as to plaintiff's claims of retaliation. Summary judgment is granted as to plaintiff's claim that she was denied PI status as a result of unlawful retaliation because plaintiff failed to show that Dr. Carlson's failure to inform plaintiff she was eligible for special or project PI status was an adverse employment action. Summary judgment is granted as to plaintiff's claim that she was appointed as Adjunct Lecturer instead of Adjunct Assistant Professor as a result of unlawful retaliation because plaintiff failed to show the appointment as Adjunct

Lecturer was an adverse employment action. Finally, summary judgment is granted as to plaintiff's claim that she was not hired as Assistant Director of the EOO as a result of unlawful retaliation because plaintiff failed to demonstrate that defendant's proffered reasons for failing to hire her were pretextual.

**IT IS THEREFORE BY THE COURT ORDERED** that the Defendant's Motion for Summary Judgment (Doc. 31) is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File a Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 40) is GRANTED.

41. *See Metzger v. City of Leawood*, 144 F.Supp.2d 1225, 1266 (D.Kan.2001).